**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.**

BROWARD CITIZENS FOR FAIR DISTRICTS,
a Florida Non-Profit Corporation; ERIC H. JONES, JR.,
individually; CHRISTOPHER L. SMITH, individually;
PERRY THURSTON, individually; T.J. REDDICK BAR
ASSOCIATION, Florida Non-Profit Corporation;

      Plaintiffs

vs.


BROWARD COUNTY, a political subdivision
of the State of Florida,

      Defendant.

_____/

## COMPLAINT

COMES NOW, Plaintiffs, the BROWARD CITIZENS FOR FAIR DISTRICTS, a Florida Non-Profit Corporation; ERIC H. JONES, JR., individually; CHRISTOPHER SMITH, individually; PERRY THURSTON, individually; T.J. REDDICK BAR ASSOCIATION, a Florida Non-Profit Corporation and files this action against Broward County ("County") on the grounds stated herein:

**I.**
**Introduction**

On December 13, 2011, the Broward County Commission[1] ("Commission") voted 6-3 to approve a redrawn Broward County Commission district map (the "District Map").

---

[1] The Commission is composed of 9 members, of whom seven are Non-Hispanic, White.  Two of the Commissioners are Non-Hispanic, Black (Commissioners Dale Holness, District 9 and Commissioner

The challenged District Map was approved as the end result of a redistricting process which is required under Broward County's Charter which mandates that the County's nine (9) single member commission districts be redrawn in nearly equal proportion based upon the County's population.  According to the 2010 U.S. Census, the Broward County population totals approximately 1,748,066 residents.[2]  Early on, at a May 3, 2011 public hearing the Commission voted to adopt a redistricting process that was designed to encourage transparency, fairness and public participation in the selection of the County's new district map.  At the same public hearing, the Commission also voted to commit itself and the public redistricting process to the same Fair Districting standards which now apply to the Florida Legislature.[3]

---

Barbara Sharief, District 8).  Six of the Commissioners are women. Eight of the Commissioners are Democrats while only one member is a registered Republican.

[2] As indicated by the 2010 Census redistricting data, Broward County has become a "minority-majority" county – for the first time, the Non-Hispanic White population accounted for less than 50% of the total population in the County in 2010.  While the Non-Hispanic Black population still remains the largest minority group at 25.7%, it is now closely followed by the Hispanic population which is less than 1 percent behind, representing 25.1% of the total population.  *See,  http://www.broward.org/ PlanningAndRedevelopment/DemographicsAndEconomics/Documents/bbtn58.pdf*

[3] Amendments 5 and 6 passed in Broward County by a vote of 73% to 27 % and 74% to 26%, respectively.  The Commission posted its commitment to implement the Fair Districting Standards on its official website, stating :

Although Broward County is not required to use Fair Districting Standards for Federal congressional and State legislative districts recently added to the State Constitution, the Board of County Commissioners determined that they should be used, to promote the public interest. Fair Districting Standards adopted by the Board of County Commissioners for the 2011 redistricting effort are:

1.     No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and, shall consist of contiguous territory.

2.     Unless compliance with the standards in this subsection conflicts with the standards in subsection 1(a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and, districts shall, where feasible, utilize existing political and geographical boundaries.

Over a seven month period following its May 3, 2011 public hearing, the Commission and its Staff, conducted no fewer than six (6) public hearings and workshops and established a protocol which encouraged the public to submit proposed maps for consideration by the Commission.  The Commission also solicited public comment[4] on both the process and the proposed maps.  At its November, 2011 public hearing, a majority of the Commission ranked and voted their approval of three separate citizen-proposed maps,[5] which were to be considered at its final public hearing on December 13, 2011.

Not surprisingly, on December 13, 2012, the Commission initiated the public hearing by, again, soliciting public comment.  However, only after the close of public comment, and without prior notice or opportunity for the public to be heard, three members of the Commission (all Non-Hispanic, White) magically produced three (3) additional maps for consideration by the Commission.  The challenged District Map is one of the three 11th hour maps.  To further add insult to injury, the proponents of the three 11th hour maps also withheld access to those new maps to four members[6] of the

---

3. The order in which the standards within subsections 1(a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

http://www.broward.org/REDISTRICTING/Pages/FairDistrictingStandards.aspx

[4] It is noteworthy that much of the comments from the public, particularly from the Black and Hispanic residents of the County were to voice their strong opposition to any vote by the Commission that would dilute the vote of minorities, sever communities of interests and subvert the public's interest in favor of Commission's own personal and political interests.
[5] The Commission voted 7-2 in favor of Map 4A, 5-4 in favor of Map 1A, with another majority vote for the "Strum Map."  Plaintiff, T.J. Reddick Bar Association was the initial proposer of Map 1A, which was later "modified" by the Commission Staff.
[6] Commissioner Holness, the only Black male on the Commission, Commissioner Chip LaMarca, the only Republican, and Commissioners Kristin Jacobs and Lois Wexler.  These were the same Commissioners who each supported Plaintiff's proposed Map 1A, and the Commission's adoption of the Fair Districting Standards.

Commission until the beginning of the discussion.[7]   The ensuing Commission discussion was heavily peppered with certain Non-Hispanic White Commissioners' reasons for reneging on adhering to the Fair Districting Standards, separating communities of interest and the racial demographics in several of the Commission Districts, including 1, 7, 8 and 9.  The Commission's ultimate vote to approve the District Map was the product of the unmitigated and expressed view of several Commissioners to preserve or enhance their own incumbency.

To achieve that end, the Commission's conduct in approving the District map intentionally and unconstitutionally targeted the Black and Hispanic residents in Districts 1, 7, and 9.  In effect, the Commission's approval of the District Map reflected the end result of purposeful and illegal racial gerrymandering, namely the act of "cracking" "diluting" or splintering specific segments of the minority community in Districts 1 and 7 and "packing segments of the Black vote in District 9, solely for the purpose of minimizing each respective District's status as a minority opportunity or influence district.[8]  The Commission's predominate focus on race in the redistricting process also rendered the electoral influence of these minority voters meaningless.  On January 31,

---

[7] Even then, Commissioners Holness and LaMarca were not given the empirical demographic data underlying the proposed districts described in the 11th hour maps.

[8] Prior to approving the District Map, the total Black and Hispanic population in District 1 was 53% (32% Black and 21% Hispanic) while its Voting Age Population was 50% (29% Black and 21% Hispanic).  In District 7, the total Black and Hispanic population was 46% (25% Black and 21% Hispanic) while the voting age population was 44% (22% Black and 20% Hispanic).

Under the challenged District Map, the Black and Hispanic total population in District 1 was clipped to 51% (23% Black and 28% Hispanic, whereas the voting age population was reduced to  22% and 27% respectively for Black and Hispanic voters.  The District Map diminishes the total Black and Hispanic population in District 7 to 43% (20% Black and 23% Hispanic.  The voting age population was diluted to just 39%

the Commission voted to move forward with a Resolution to be voted upon on February 14, 2012, adopting the District Map.

## II.
## Nature of the Case

1.  This is an action to enforce Section 2 of the Voting Rights Act of 1965 (*42 U.S.C. §. 1973*), the Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Fourteenth Amendment (*U.S. Const. Amend. XIV*).  Plaintiffs seek declaratory and injunctive relief against implementation of the Commission's District Map, on the grounds that the said District Map violates both the Voting Rights Act and the United States Constitution by engaging in intentional and purposeful racially discriminatory conduct and practices in the Commission's redistricting process which conduct predominantly focused on stripping minority voters of their right to an equal opportunity to participate in the political process and to select candidates of their choice. The Commission's racially discriminatory conduct included the following:

a.  Intentionally removing Black and Hispanic voters from different contiguous areas of County Commission District 7 (Fort Lauderdale) and dispersing said minority voters into District 9, with the specific purpose of "cracking" and minimizing the minority electorate in District 7.  This was particularly because of the incumbent's (a non-Hispanic White male) experience in the two most recent County Commission election cycles. In the 2002 County Commission race, although the incumbent won re-election, a then relatively unknown Black candidate (hereinafter referred to as "RM") garnered almost 45% of the vote.  In the subsequent Commission District

7 race in 2006, the incumbent won again, but this time, by less than 150 votes and only because RM split the minority vote with a second Black candidate.   During the Commission's recent redistricting process, the same incumbent made clear that District 7 needed to be "bleached";

b.      Intentionally re-drawing the District 7 geographic boundaries with the specific purpose of removing the residential address of RM from within the District 7 boundaries and into another Commission district solely because RM is Black and had already publicly announced his intent to again challenge the incumbent as the candidate of choice for the electorate in the next District 7 election. The race-based gerrymandering of District 7 was done primarily to enhance the opportunity of the non-Hispanic White incumbent or one of his chosen allies to defeat the minority electorate's candidate of choice;

c.      Intentionally splintering a certain residential neighborhood (Inverrary) which represents a single community of interest for the sole reason that the community is predominately Black and for the sole purpose of "cracking" the political influence of the minority electorate while, at the same time, enhancing the influence of the non-Hispanic Whites in District 1, a known minority opportunity or influence district;

d.      Intentionally dispersing other Black residents and voters from certain other communities in District 1, namely North Lauderdale and Lauderhill, solely on the basis of their race and placing those Black voters into Commission Districts 3 and 9 for the specific illegal purpose of further "cracking" the

concentration of Black voters in District 1 in order to minimize their political influence, as well as to enhance the political influence of the non-Hispanic White electorate in a known minority opportunity or influence district;

e.    Packing an extraordinary and disproportionate number of minority voters (70% Blacks and 86% total minorities) into one district—County Commission District 9 thereby impermissibly diluting the electoral vote of Black voters in Districts 1 and 9. Removing Black voters from different contiguous areas of County Commission District 7 (Fort Lauderdale) and moving said voters into District 9, thereby simultaneously "packing" District 9 while "diluting" the Black vote in District 7;

f.    Intentionally and on the predominant basis of race, engaging in racial gerrymandering of the geographic boundaries of Commission District 1, for the specific purpose of capturing the residential address of a specific non-Hispanic White male who is also an incumbent Florida legislator whose residential address, under the existing Commission Districts, was geographically fixed in Commission District 5. The District Map's inexplicable and otherwise arbitrary jog from a straight line patently serves no other purpose than to capture this incumbent legislator's home. It further serves to enhance the legislator's opportunity to capitalize on his current political position in order to prevail in a Commission District 1 race in which the influence of an otherwise minority opportunity or influence electorate has been substantially diminished by the purposeful and discriminatory conduct of the Commission.

f.  Intentionally "packing" the Black voting community into District 9 and "diluting" the Black vote in other districts in an intentional effort to diminish and weaken the political strength of Black voters across Broward County;

g.  Approving the District Map without giving Plaintiffs and the public the benefit of prior notice and a meaningful opportunity to be heard in advance of the Commission's consideration and ultimate approval of the District Map, which was only presented for consideration at the 11th hour. The Commission withheld critical demographic data underlying the District Map from at least three of the Commissioners.  The three Commissioners were then asked to vote on the District Map without any real meaningful opportunity to analyze such map or to engage in any public dialogue or to receive comments from the Plaintiffs or their own District constituents.

h.  The Commission, by its prior conduct, induced Plaintiffs, as well as the general public to believe, as late as November 2011, that the Commission intended to fully and fairly apply the Fair Districting Standards throughout the completion of the redistricting process.  As such the Commission's 11th hour conduct on December 13, 2011, in which it—without notice— introduced and voted on the District Map, violated basic standards of fairness and the Due Process Clause of the Fourteenth Amendment;

i.  Improperly considering race as the primary reason for drawing the districts in the manner in which they were drawn.  Upon information and belief, the incidents evidencing improper reliance upon race as a factor include; (1) holding meetings out of the Sunshine; (2) comments made by one

8

Commissioner during the public hearing process confirming that race was a factor; and, (3) comments made by one Commissioner to other County Commissioners and members of the general public that a particular District seat needed to be "bleached";

## III.
## Jurisdiction

1.      Plaintiffs invoke the jurisdiction of this Court under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 2201, this suit being authorized by 42 U.S.C. §§ 1973j(f) and 1983.

## IV.
## Parties

2.      The Broward Citizens For Fair Districts is a Florida Non- Profit Corporation incorporated under the laws of Florida.

3.      Eric H. Jones, Jr. ("Mayor Jones") is a Broward County resident of Broward County Commission District 8.  He serves as the Mayor of the City of West Park and is the Chairman of the Broward County Black Elected Officials.  Mayor Jones is also the Chair of the South Broward Ministerial Alliance.

4.      Christopher L. Smith, ("Senator Smith") is a resident of former Broward County Commission District 7, proposed Broward County Commission District 9. Senator Smith is a State of Florida Senator Representing District 29, encompassing parts of Broward and Palm Beach Counties. In 1998, he was elected to the Florida House of Representatives for District 93.    He was re-elected and served two

consecutive terms in 2000 and 2002. He previously served as the Democratic House Leader and Democratic Leader Pro Tempore.

5.      Perry E. Thurston ("Rep. Thurston") is a resident of Broward County and Commission District 9. Rep. Thurston serves as the State of Florida House of Representative for District 93. He has served in this position since 2006. Rep. Thurston was elected by the House Democratic Caucus as its leader for the 2012-2014 legislative terms.

6.      The T. J. Reddick Bar Association is an association registered as a non-profit corporation within the State of Florida. The membership is primarily comprised of Black and minority attorneys throughout Broward County.

## V.
## Statement of facts

7.      All preconditions for bringing a claim that the Broward County redistricting plan violates § 2 of the Voting Rights Act as announced in *Thornburg v. Gingles*, 478 US 30 (1986) have been met. Specifically, the Black and Hispanic voting electorate in Commission Districts 1 and 7; (a) have become sufficiently large and geographically compact to constitute a majority in those districts; and, (b) are politically cohesive. As a result of the voting population and historical electoral performance, both Districts are known minority opportunity or influence districts. Additionally, the non-Hispanic White population votes sufficiently as a bloc to usually defeat the Black and Hispanic electorate's preferred candidate.

8.      Broward County is a majority-minority political subdivision, that is, the minority population, including the Black population, is sufficiently large and geographically compact enough to impact the vote in several existing County

10

Commission Districts and hence the overall make-up of the Broward County Commission.

9.      The historical effects of discrimination and limited access on the Black and other minority citizens of Broward County, including and evidenced by several Black and minority communities with markedly lower socioeconomic conditions relative to their counterpart white citizens, continue to hinder the ability of Black and other minority citizens to effectively participate in business, government and the political process in County elections.

10.     Political campaigns in several Broward County Districts have been characterized by appeals to cultural, ethnic and racial affinity groups.

11.     Redistricting occurs every 10 years to reflect changes in the county population and is required by Section 2.01 (A) of the County Charter to balance the populations of the Districts and to ensure that residents have the opportunity for equal representation of their choosing on the County Commission.

12.     Based upon the 2010 Census, the Commission determined that at least three Districts, specifically Districts four (-11.9%), eight (+32%) and nine (-7%), exceeded the desired population variation (+/- 5%) typically found to be acceptable under general redistricting principles and as such, had to be reduced to within acceptable population variations.

13.     Before the 2010 census, the County commission had last adopted new districts in early 2002 following the 2000 Census.

14.     In anticipation of, and to govern the redistricting exercise, the County Commission unanimously adopted a Broward County ordinance modeled upon the

2010 Florida Constitutional Amendments 5 and 6 and instructed the Commission Staff to complete the process of redistricting with as much input from the community as possible.

15.     On September 13, 2011, the County approved the schedule for the redistricting public hearings, scheduling public hearings to be held on November 8, 2011 and December 13, 2011, respectively. The commission also set a deadline of October 21, 2011 for public submission of maps for the Commission's consideration.

16.     At the November 8, 2011 public hearing, after several rounds of discussion and votes, the commission instructed staff to work with three maps. The maps selected, by a Commission vote of 7-2, were Map # 4A and the maps submitted by Robert Strum, and Plaintiff, the T.J. Reddick Bar Association.

17.     The challenged District Map does not reflect the changes in population demographics since the 2010 census, but rather, is a product of the Commission's predominate discriminatory focus on "cracking" or dispersing the minority electorate, particularly in known minority opportunity and influence districts such as Districts 1 and 7, in an effort to dilute, marginalize or render meaningless the electoral vote or influence of Black and Hispanic voters and thereby to preserve the non-Hispanic White incumbent majority voting advantage in those Commission Districts.

18.     The challenged District Map does not reflect the changes in population demographics since the 2010 census, but rather, is a product of the Commission's predominate discriminatory focus on "packing" or concentrating the minority electorate in District 9, a particularly known minority-majority District, thereby reducing the influence and impact of such votes in districts such as Districts 1 and 7, in an effort to

dilute, marginalize or render meaningless the electoral vote or influence of Black and Hispanic voters and thereby to preserve the non-Hispanic White incumbent majority voting advantage in several Commission Districts while minimizing the voting impact of the "packed" voters in District 9.

19.     Several community workshops were conducted where redistricting maps were submitted for consideration by the Commission in addition to a map from the T.J. Reddick Bar Association as well as several Staff maps.

20.     The District Map dilutes constitutionally protected minority voting rights in several of the nine commission districts by removing blocks of minority voters from certain districts and packing those minority voters into one or more concentrated Districts.

21.     Specifically, contiguous sections of minority voters were segmented and blocks moved from Districts 1 and 7, respectively, and into District 9, and from District 9, into Districts 3 and 4 where a small percentage increase in the Black and minority votes would have little or no impact.

22.     These actions improperly and artificially dilute the voting strength of the Black and Hispanic communities in these two districts, effectively rendering their vote impotent against a cohesive block of majority votes.

23.     The County Commission's District Map "packs" a large number of the Black vote (in central Broward) into a single Commission district, District 9, by shifting Black voters into and out of the surrounding Districts with the intent to dilute the voting strength of a federally protected class of the electorate.

24.     The District Map supports incumbents and their political allies in Districts 1 and 7, respectively, where non-Hispanic White candidates, who have already announced or indicated their intention to run for seats on the County Commission, will benefit from the illegal effect of the Commission's actions resulting in the dilution of Black and Hispanic voters.

25.     The Black and Hispanic electoral vote in Commission Districts 1 and 7 were effectively "bleached", according to Commission District 7's incumbent Commissioner who, prior to the emergence of the District Map—which he voted to approve—complained that he could not win with so many "African-Americans" in his District.

26.     The District Map improperly reflects the County Commission's personal political interests and political agendas for ensuring their incumbency and that of known political colleagues over the public's interests in fairness and having a redistricting process that is free from practices imposed in a manner that result in the denial or abridgement of the right to vote.

27.     Unless enjoined by this court, the County commission will approve and implement the District Map and conduct elections pursuant to the District Map for the Broward County Commission.

28.     The District Map for Broward County initially approved by the County Commission will go into effect for the next County elections which are scheduled for November, 2012.

29.     The District Map can be redrawn to avoid illegal and unconstitutional diluting and packing of the Commission districts, particularly Districts 1, 7 and 9, to the

detriment of the Black and minority vote in Broward County. Several alternate maps were presented to the County Commission which could potentially achieve the objectives of the County's redistricting mandate without violating the constitutional rights of the Black and other minority voting population.

**VI.**
**First Cause of Action**
**(42 U.S.C. Sec. 1983; 42 U.S.C. Sec. 1973;**
**Equal Protection, One Person One Vote, U.S. Constitution Amend. XIV)**

30.   Plaintiffs re-allege and re-plead the allegations in paragraphs 1 through 29 of this Complaint and incorporate them herein by reference.

31.   This Court can and should grant an injunction and/or issue a declaratory judgment that the existing County Redistricting Plan evidenced by the District Map has the purpose and result of denying or abridging the right of Black citizens and other minorities to vote for candidates of their choosing, because of discriminatory incumbent actions to intentionally draw district lines based primarily on race. Plaintiffs' rights are guaranteed by Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause of the Fourteenth, and the Due Process Clause of the Fourteenth Amendments.

**VII.**
**Second Cause of Action**
**(42 U.S.C. Sec. 1983; 42 U.S.C. Sec. 1973;**
**Equal Protection, Under U.S. Constitution Amend. XIV)**

32.   Plaintiffs re-allege and re-plead the allegations in paragraphs 1 through 29 of this Complaint and incorporate them herein by reference.

33.   This Court can and should grant an injunction and/or issue a declaratory judgment that the existing Commission redistricting plan as evidenced in the District

Map has the purpose and result of denying or abridging the right of Black voters in Broward County to effectively participate in the political process with a politically cohesive voice in light of the community having been packed in one County Commission District and cracked or diluted in other districts, in violation of Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause of the Fourteenth Amendment.

**VIII.**
**Third Cause of Action**
**(42 U.S.C. Sec. 1983; 42 U.S.C. Sec. 1973;**
**<u>Equal Protection, Under U.S. Constitution Amend. XIV)</u>**

34.     Plaintiffs re-allege and re-plead the allegations in paragraphs 1 through 29 of this Complaint and incorporate them herein by reference.

35.     This Court can and should grant an injunction and/or issue a declaratory judgment due to the fact that the Commission represented to the public that it would follow the State of Florida redistricting standards that were approved by Florida voters in 2010.  The County Commission failed to follow its own proposed standards.  Further, the public was never afforded the opportunity to comment on the District Map that was ultimately approved by the Broward County Commission.

36.     The failure of the Commission to allow voters to have notice of the District Map and an opportunity to be heard on the District Map resulted in a redistricting plan that would deny or abridge the right of Black or voters in Broward County to effectively participate in the political process in violation of Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause of the Fourteenth Amendment.

**IX.**
**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment as stated below:

1.      Injunctive relief prohibiting the final implementation of the District Map to ensure compliance with the United States Constitution;

2.      A judgment declaring that the existing Commission's Redistricting Project, as evidenced by the District Map has the purpose and result of denying or abridging the right of Black citizens to vote for candidates of their choosing, because of discriminatory incumbent tactics in violation of Plaintiffs' rights guaranteed by Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause of the Fourteenth Amendment of the Constitution;

3.      A judgment declaring that the existing Commission Redistricting Project, as evidenced by the District Map has the purpose and result of denying or abridging the right of Black voters, a politically cohesive voice in light of the community having been diluted in County Commission districts 1 and 7 and packed in County Commission District 9.  These actions are in violation of Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause of the Fourteenth Amendment;

4.      A judgment declaring that the Broward County Commission violated the due process provisions of the Fourteenth Amendment of the U.S. Constitution by failing to afford the public notice of the Proposed Map and an opportunity to be heard prior to the vote;

5.      For reasonable costs of suit and attorney's fees; and

6.     For such other and further relief as the court may deem just, proper, and appropriate.

Respectfully submitted,

//s// JOHNNY L. MCCRAY, JR
JOHNNY L. MCCRAY, JR.
Fla. Bar No.  0342319
400 East Atlantic Blvd.
Pompano Beach, FL 33060
Telephone: 954.781.3662
Email: mccray400@bellsouth.net

ROBERT C.L. VAUGHAN
Fla. Bar No. 130095
WARD KIM VAUGHAN & LERNER, LLP
1 Financial Plaza, Ste, 2001
Fort Lauderdale, FL  33394
Ph:    (954) 527-1115
Fax:   (954) 527-1116
rvaughan@wardkim.com

*Attorneys for Plaintiffs*